Robert Tauler  (SBN 241964)
rtauler@taulersmith.com
Kiran Sekhon (SBN 360474)
ksekhon@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 1100
Los Angeles, California 90017
Tel: (213) 927-9270

*Attorneys for Plaintiff Dana Hughes*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANA HUGHES, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>VALLEY NATIONAL BANK, a New Jersey company; and DOES 1 through 15, inclusive,<br><br>　　　　　Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**1. VIOLATIONS OF THE CALIFORNIA TRAP AND TRACE LAW (CAL. PENAL CODE § 638.51)** |

CLASS ACTION COMPLAINT

## INTRODUCTION

1. Defendant's website is crawling with spyware from multiple data brokers, including software from data brokers LiveRamp, Adroll and Outbrain. With the aid of these data brokers, Defendant can secretly learn who has visited their website, and can purchase profiles sold by data brokers about them, so that Defendant can solicit people who do not know they have been subjected to organized and highly sophisticated surveillance, since Valley Bank never discloses it.

2. According to its website, Valley National Bank offers "comprehensive financial services, including personal and business banking, loans, mortgages, and wealth management" including by operating a branch in this district.

3. Defendant runs afoul of California law by not disclosing its surveillance regime in any form.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

5. Defendant Valley National is a New Jersey company that offers banking services. Defendant actively markets its services to California individuals and organizations. Defendant maintains ongoing commercial relationships with California customers, including through its operations in this county. Valley National Bank operates a branch in Beverly Hills, and is a member of the Beverly Hills Chamber of Commerce.

6. Defendant deliberately avails itself of California's commercial privileges by informing California residents of its presence in this district, and operating its interactive Website infrastructure, which Defendant specifically

designed to engage California customers. Defendant's continuous California business activities establish general personal jurisdiction sufficient for this Court to adjudicate any claims against Defendant.

7. This Court possesses specific personal jurisdiction over Defendant because Defendant expressly aimed and directed its tortious activities at California residents.

8. Defendant deliberately engineered and programmed its Website with tracking technology to capture data from California-based internet users while those users browsed from within California's territorial boundaries. Defendant transformed its own Website into the instrument of its unlawful surveillance in California.

9. Defendant specifically intended its surveillance operations to cause injury to California residents. Defendant configured its tracking systems on its Website to identify, profile, and exploit California users.

10. Defendant's purposeful direction of its surveillance activities at California residents through its own Website satisfies all constitutional due process requirements for the exercise of specific personal jurisdiction by this Court.

11. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District; and (4) the injury to Plaintiff occurred within this District.

12. A substantial part of the events giving rise to this action, namely Defendant's activation of its surveillance system against Plaintiff, occurred within this District. Defendant's system activated during Plaintiff's Website visit while Plaintiff was physically located within this District.

13. This activation by Defendant created the privacy violations and

CLASS ACTION COMPLAINT

3

statutory damages at issue in this litigation.

## PARTIES

14.    Plaintiff Dana Hughes ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Central District of California. Plaintiff maintains reasonable expectations of privacy when browsing websites. Defendant systematically violated these expectations through its unauthorized surveillance activities.

15.    Valley National Bank ("Defendant" or "Valley National") uses data broker software on its website – https://valley.com/ (the "Website") which it owns, operates, and/or controls https://valley.com/ (the "Website"). Through the Website, Defendant offers banking services.

16.    Plaintiff identifies Doe Defendants 1 through 15 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's system. Plaintiff will seek leave to amend this Complaint to identify these entities when Defendant's discovery responses reveal their true names and roles.

17.    Each Doe Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each Doe Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

## FACTUAL ALLEGATIONS

### Registered California Data Brokers

18.    Data Brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data about individuals and organizations. Data Brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

19.    Data Brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

20.     Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual.  The data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

21.    Data Brokers are accumulating data and profiling individuals to an alarming extent.  As the CEO of a Data Broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual:  "We know who she is, what she watches, what she reads, and who she lives with.  [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys.  We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation."[1]

22.    Given the amount of data available by way of the Data Brokers' practices, a company like Defendant has an incentive to partner with a Data Broker so that it can learn the identity of their website visitors in order to harass them with unwanted solicitations.

23.    Defendant has in fact partnered with the Data Brokers mentioned herein, by installing software on the Website in order to deanonymize, identify and target prospective customers, while allowing Data Brokers to access, use, and monetize the data provided by Defendant, in manners that are never shared with anyone outside of their organization who does not purchase it.

---

[1] Lucas Ropek, Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users, March 15 2025 (Gizmodo.com).

CLASS ACTION COMPLAINT

5

**Defendant and the California Data Brokers**

24. Defendant's installation and use of Data Broker Software violates the California Trap and Trace law.

25. Specifically, Defendant has installed the Data Broker Software of LiveRamp, Nextroll (AdRoll), and Outbrain (collectively, the "Data Broker Software").

**LiveRamp**

26. LiveRamp is one of the largest data brokers in California, specializing in deanonymization of website users. The LiveRamp Software tracks online signals from a website visit and matches it with their vast database to create a universal serial number for a person called a "RampID." The LiveRamp Software functions as follows:

27. First, when the LiveRamp Software loads on a webpage, it immediately captures the user's identifiers present in that context – e.g. reading any first-party cookie ID or a platform's ID that the page passes, as well as standard header info like IP and user-agent.

28. Second, the data obtained by the LiveRamp Software is sent to LiveRamp's servers where LiveRamp combines the data obtained from a visit to Defendant's website with other data it has obtained about the individual both online and offline. This data includes name and postal address, email address, cookie IDs, and mobile device IDs.

29. Third, through this process, the user is matched with their pre-existing "RampID" (data broker serial number). LiveRamp's RampID is permanent, and designed to persistently track an individual across thousands of websites. RampIDs do not change with clearing cookies or switching devices.

30. The RampID, and the data associated with it, is widely shared with dozens of ad tech partners so that all parties who pay for it can identify the user, and see the user's online habits.

**Nextroll (Adroll)**

31.    NextRoll, Inc. (formerly known as AdRoll, Inc.) is a marketing technology company specializing in retargeting and targeted advertising services.  NextRoll appears on the California Data Broker Registry, indicating it trades in the personal data it collects (for example, by assembling audience segments or profiles that are used in advertising). NextRoll's services reach across a vast network of websites and advertising exchanges, and the company openly touts its ability to recognize users across different sites and even across devices for marketing purposes.

32.    The Nextroll Software is a snippet of JavaScript that website owners embed in their site's HTML, typically in the header. Once installed, the pixel tracks essentially every action a visitor takes on the site. NextRoll's own help center describes the AdRoll Pixel as code that "tracks everything your visitors are doing on your site"  The Nextroll Software functions as follows:

33.    First, when a user loads a page, the Nextroll Software executes and sends an HTTP request to NextRoll's servers, including various pieces of information about the visitor's session. According to NextRoll's documentation, the Nextroll Software collects HTTP header data – this includes the user's IP address, their browser user agent (which reveals browser version and operating system), the referrer URL (i.e. where they came from), and the current page URL. In addition, the Nextroll Software captures site-specific data: it attaches an "advertisable ID" and "pixel ID" to identify the website/ad account in NextRoll's system (so NextRoll knows which client's site the data came from). It then records user actions on the page (what NextRoll calls "Site Activity") such as page views, clicks on certain elements, form submissions, items added to cart, and other conversion events.

34.    Second, NextRoll then assigns each browser a "User identifier" the first time the AdRoll pixel sees that browser.  This is a persistent cookie stored in the user's browser (often named something like "adroll" or "nextroll" cookie) that

allows NextRoll to recognize the same user on subsequent visits or on other websites that also have AdRoll tracking. NextRoll's ID cookie means the tracking persists beyond the single site. If another unrelated website also uses AdRoll, that same cookie ID will be recognized and the user's new visit will again be captured and associated with their existing profile.

35. Third, Nextroll platform performs "cookie matching," meaning it will compare its own user identifier with identifiers used by other ad platforms in order to broaden the reach of tracking and ad delivery.  For example, if NextRoll's pixel finds a user, NextRoll can later synchronize that user's ID with, say, a Facebook or Google cookie to continue tracking user activity across the internet, storing all of the information in each discrete user profile.

### Outbrain

36. Outbrain is a content recommendation platform, advertising network and personalization engine for content. Outbrain is registered as a data broker in California.

37. Outbrain's deanonymization software, deployed on the website, functions by collecting the device type, browser type, operating system, and referring URLs of the visitor's computer.  The software then uses the visitor's IP address into a geolocation to create a fixed set of characteristics it can use to identify a visitor..

38. Outbrain then assigns this data a Unique User ID (UUID). This UUID is an identifier that Outbrain uses to keep track of that user on any "Outbrain-enabled" site. Outbrain then logs information about the user's interaction with the page and stores it in order to accumulate a browsing profile about a user without their consent, which it can then sell back to anyone on the open market.

### Plaintiff Was Subjected to the Trap and Trace Device on the Website

39. Plaintiff visited the Website on February 11, 2025.  When Plaintiff did so, their identifying information by way of electronic impulses was sent to the Data

Broker Software. The purpose of this transfer of data from Defendant to the Data Broker Software was for de-anonymization, profiling, and targeting. The transfer benefitted both Defendant and the Data Broker Software financially.

40. On information and belief, the Data Broker Software took Plaintiff's information and added the information to its profiles of Plaintiff. In turn, Defendant received other relevant data obtained by the Data Broker Software regarding Plaintiff. the Data Broker Software can use the information regarding Plaintiff's visit to the Website to further profile Plaintiff, with the objective of monetizing this data by selling or licensing it to other entities, including law enforcement and government agencies.

41. In this regard, a recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[2] There are recent examples of tech companies exchanging information with the federal government in ways that threaten harm to women's freedom, minority viewpoints and marginalized United States citizens or residents. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[3] Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[4]

42. The prospect of private entities such as Data Brokers sharing data they

---

[2] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole

[3] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/.

[4] https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185.

CLASS ACTION COMPLAINT

9

have collected and organized into individualized profiles with government entities has increased significantly in 2025. Columbia and Brown Universities recently agreed to turn over data about applicants and students, such as their race, grades and standardized test scores to the federal government.[5] During this year, tech companies have complied with unprecedented demands for concessions from the federal executive branch.[6] Further, the current federal administration has threatened retaliatory action against pharmaceutical companies that refuse to comply with demands to lower drug prices.[7] No clear legal authority exists preventing the sale or dissemination of user data by Data Brokers to the federal government.

43.   The only purpose of the Data Broker Software is to identify users. The Data Broker Software are aimed at developing a demographic assessment of a website's audience, and to identify its interests. It captures such information as user agent and IP address that can help identify a user across websites and platforms using the Data Broker Software.

44.   The Data Broker Software meet the definition of a "trap and trace device" under Cal. Penal Code § 638.50(c) because the Data Broker Software' process captures signaling information (who the visitor is, and what he or she is doing) in order to identify the source of an otherwise anonymous website visit – which such visit constitutes an electronic communication.

45.   There is no way for Plaintiff to learn what the Data Broker Software did with Plaintiff's data, including what inferences the Data Broker Software has

---

[5] *See, e.g.,* Sharon Otterman & Anemona Hartocollis, "Columbia and Brown to Disclose Admissions and Race Data in Trump Deal," (New York Times Aug. 6, 2025), found at https://www.nytimes.com/2025/08/05/nyregion/columbia-brown-admissions-trump.html.
[6] *See, e.g.,* Rob Wile & Allan Smith, "The CEO in chief: How Trump is getting what he wants from big business," (NBCNews.com Aug. 14, 2025), found at https://www.nbcnews.com/business/business-news/what-trump-involvement-major-corporations-means-us-politics-business-rcna224630.
[7] *See, e.g.,* Anna Bratulic, "In latest Trump salvo, pharma giants face 60-day ultimatum on price cuts," (First Word Pharma, July 31, 2025), found at https://firstwordpharma.com/story/5985417.

gleaned from it, or when, why and to whom the Data Broker Software has sold or licensed Plaintiff's data.  As such, Plaintiff has been injured by Defendant's surveillance practices.

46.    Plaintiff was never informed of, and therefore could not have consented to, data collection by the Data Broker Software for mercantile purposes.  Plaintiff has no way to know the scope of the injury suffered because the Data Brokers, including the Data Broker Software, operate in secret and without public disclosure of their operations.

**The Data Broker Software are Trap and Trace Devices.**

47.    CIPA defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."  Cal. Penal Code § 638.50(c).

48.    The Data Broker Software are a process to identify the source of electronic communication by capturing electronic impulses sent out from Website users' devices and identifying dialing, routing, addressing, and signaling information about or generated by the users.  The users are never informed that the Website is collaborating with the Data Broker Software to obtain their phone numbers and other identifying information.

49.    The Data Broker Software are "reasonably likely" to identify the source of electronic impulses sent from devices visiting the Website.  In fact, the Data Broker Software are designed solely to meet this objective.

50.    Defendant did not obtain a court order before installing or using the Data Broker Software on its Website.

51.    Defendant did not obtain the express or implied consent of Plaintiff to be subjected to data sharing with the Data Broker Software for the purposes of de-anonymization, profiling, and targeting.

52. Defendant is statutorily ineligible to assert consent as a defense to its illegal use of a Trap and Trace device. Under Penal Code § 638.51(b), a consent defense is only available to a "provider of electronic or wire communication service," which Defendant is not.

53. The California Invasion of Privacy Act ("CIPA"), California Penal Code § 630 *et seq.*, imposes civil liability and provides for statutory damages for the installation and use of trap and trace software without a court order. *Id.* §§ 637.2, 638.51; *see Moody v. C2 Educ. Sys. Inc.*, No. 2:24-CV-04249-RGK-SK, 2024 WL 3561367 (C.D. Cal. July 25, 2024) (holding that data broker software was properly alleged to be a trap and trace device because it communicates over the internet and the statutory definition of a trap and trace device expressly covers "wire communication" and "electronic communication," and is not limited to telephone lines).

## CLASS ALLEGATIONS

54. Plaintiff brings this action individually and on behalf of all others similarly situation (the "Class") defined as follows:

> **All persons within California whose identifying information was sent to California Data Brokers including the Data Broker Software as a result of visiting the Website within the limitations period.**

55. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

56. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the

individual circumstances of any Class Member, include but are not limited to the following:

    a. Whether the Data Broker Software are a trap and trace process as defined by California law;

    b. Whether Plaintiff and Class Members are entitled to statutory damages;

    c. Whether Class Members are entitled to injunctive relief; and

    d. Whether Class Members are entitled to disgorgement of unlawfully obtained data.

57. TYPICALITY: As a person who visited Defendant's Website and whose personal information was fingerprinted and de-anonymized by the Data Broker Software, Plaintiff is asserting claims that are typical of the Class.

58. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

59. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class Member is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

## FIRST CAUSE OF ACTION

### Violations of California Trap and Trace Law

### Cal. Penal Code § 638.51 (the "California Trap and Trace Law")

60. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

61. The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

62. A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." *Id.* § 638.50(c).

63. The Data Broker Software, as deployed on the Website, constitute a trap and trace device under Cal. Penal Code § 638.50(c). The Data Broker Software are designed to identify the source of the electronic and wire communications sent from the devices of users in California visiting the Website in violation of the California Trap and Trace Law.

64. Defendant did not obtain a court order before using or installing the Data Broker Software on the Website. Defendant also did not obtain consent from Plaintiff or any of the Class Members before using trap and trace technology, including the Data Broker Software, to identify visitors to its Website.

65. CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also C2 Educ. Sys. Inc.*, 2024 WL 3561367.

## **PRAYER**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel;

2. An order that data unlawfully obtained by Defendant's deployment of a trap and trace device be disgorged;

3. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

4.   Statutory damages pursuant to CIPA;

5.   Reasonable attorneys' fees and costs; and

6.   All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: February 6, 2026                    TAULER SMITH LLP

                                           By:   */s/ Robert Tauler*
                                           Robert Tauler, Esq.

                                           *Attorneys for Plaintiff Dana Hughes*

CLASS ACTION COMPLAINT

15

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: February 6, 2026                    TAULER SMITH LLP

                                           By:   */s/ Robert Tauler*
                                           Robert Tauler, Esq.

                                           *Attorneys for Plaintiff Dana Hughes*